[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 15-14586

————————————————

D.C. Docket No. 5:03-cv-02399-SLB

CORY R. MAPLES,

Petitioner-Appellant,

versus

COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.

————————————————

Appeal from the United States District Court
for the Northern District of Alabama

————————————————

(April 5, 2018)

Before WILSON, JILL PRYOR, and HULL[*], Circuit Judges.

WILSON, Circuit Judge:

———————————

[*] Judge Hull was in active service when this case was orally argued, but subsequently took senior status.

Cory R. Maples, an Alabama death-row inmate, appeals the district court's denial of his 28 U.S.C. § 2254 amended petition for writ of habeas corpus. We granted Maples a Certificate of Appealability (COA) as to one claim: "Whether the district court erred in denying [Maples's] claim that his trial counsel rendered ineffective assistance of counsel in the investigation and presentation of mitigating evidence during the penalty phase of [Maples's] 1997 trial?" Having considered the state court record, the district court's order, the parties' submissions, and with the benefit of oral argument, we vacate the district court's denial of Maples's amended § 2254 petition as to that penalty-phase mitigation claim and remand for an evidentiary hearing and fact findings as outlined below.[1]

## I. BACKGROUND

When Maples was 21 years old, he confessed to shooting and killing two friends and fleeing in a car belonging to one of the friends after a long day of drinking. Two years later, he was convicted of murder and the jury recommended the death penalty, by a vote of 10 to 2[2]; the state trial court subsequently accepted that recommendation. The court found one statutory aggravating factor (murder during a robbery), one statutory mitigating factor (Maples had a limited criminal

---

[1] To the extent necessary, we sua sponte expand the COA to include the issue of whether Maples should be granted an evidentiary hearing on his penalty-phase mitigation claim. *See Thomas v. Crosby*, 371 F.3d 782, 796 (11th Cir. 2004) (Tjoflat, J. concurring) ("[O]ur cases establish the power of our court to add issues to a COA sua sponte.").

[2] Under Alabama law, at least 10 jurors must agree to recommend the death penalty. *See* Ala. Code § 13A-5-46(f).

2

history), and a few non-statutory mitigating factors.  After concluding that Maples's mitigating factors were weak and unpersuasive, the court found that the single statutory aggravating factor justified imposing the death penalty.

In July 2001, Maples filed his initial Rule 32 petition for habeas relief in Alabama state court.  In September 2001, the State filed a response and a proposed order denying the petition.  In December 2001, Maples filed an amended Rule 32 petition that contained significantly more factual allegations about his penalty-phase mitigation claim, and the state habeas court accepted the petition; but no evidentiary hearing was held.    Then, in 2003, the court dismissed Maples's petition on the pleadings and signed the State's *September 2001* proposed order, even though the order was drafted *before* Maples filed his amended Rule 32 petition.  Thus, the order did not address Maples's new allegations.  In signing the order, the court merely struck through "2001" on the signature line and wrote in the 2003 date.

Because Maples did not timely appeal this Rule 32 order, albeit through no fault of his own as his counsel at the time had abandoned him, no state appellate review occurred.  As a result, the district court in his federal § 2254 case determined that Maples's penalty-phase mitigation claim was procedurally defaulted.  This court later affirmed that determination.  *Maples v. Allen*, 586 F.3d 879, 886–91 (11th Cir. 2009) (per curiam).  The United States Supreme Court,

3

noting the abandonment by his own counsel, granted certiorari as to the procedural-default issue, vacated this court's ruling, and remanded, concluding that "ample" cause exists to excuse Maples's procedural default. *See Maples v. Thomas*, 565 U.S. 266, 280, 289–90, 132 S. Ct. 912, 922, 927–28 (2012). However, the Court left open the question of whether actual prejudice exists. We then remanded the case back to the district court to consider actual prejudice in the first instance.

On remand, the district court, without holding an evidentiary hearing and applying AEDPA deference,[3] concluded that Maples's penalty-phase mitigation claim was procedurally defaulted for lack of prejudice. Because the standard for

---

[3] Because the state habeas court denied Maples's ineffective assistance of counsel claim on the merits, the district court reviewed the claim under the standards set by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See Williams v. Taylor*, 529 U.S. 362, 402-03, 120 S. Ct. 1495, 1518 (2000). AEDPA bars federal courts from granting habeas relief to a petitioner on a claim that was adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "'[C]learly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 1172 (2003). With respect to § 2254(d)(2), "[s]tate court fact-findings are entitled to a presumption of correctness unless the petitioner rebuts that presumption by clear and convincing evidence." *Conner v. GDCP Warden*, 784 F.3d 752, 761 (11th Cir. 2015).

4

actual prejudice overlaps with the standard for *Strickland*[4] prejudice, *see Strickler v. Greene*, 527 U.S. 263, 289, 119 S. Ct. 1936, 1952 (1999), the court focused its analysis on whether Maples's penalty-phase mitigation claim satisfied *Strickland*'s prejudice prong.  In doing so, the court found reasonable the state habeas court's conclusion that Maples, in his amended Rule 32 petition, did not allege facts that established *Strickland* prejudice, and determined that the claim was procedurally defaulted.  This is Maples's appeal of that determination.

## II. DISCUSSION

Like the district court, we too focus our analysis on *Strickland* prejudice.  But we, unlike the district court, conclude that the state habeas court's rejection of Maples's ineffective assistance of counsel claim was unreasonable under 28 U.S.C. § 2254(d)."[5]  We also conclude, upon a de novo review, that Maples pleaded facts in his amended Rule 32 petition that, if proven, "would entitle him to habeas corpus relief." *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1280 (11th

---

[4] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984).  Under *Strickland*, a defendant has a Sixth Amendment right to effective assistance of trial counsel.  *Id.* at 686, 104 S. Ct. at 2063.  Counsel renders ineffective assistance, warranting vacatur of a conviction or sentence, when his performance falls "below an objective standard of reasonableness," taking into account prevailing professional norms, and when, upon a reweighing of all of the evidence old and new, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694-95, 104 S. Ct. at 2064, 2068-69.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S. Ct. at 2068.

[5] Because Maples "did not fail to develop the factual basis of his claim[] in state court through any omission, fault, or negligence that can fairly be attributed to him," 28 U.S.C. § 2254(e)(2) does not a bar him from accessing an evidentiary hearing.  *See Daniel*, 822 F.3d at 1281 (internal quotation marks omitted).

5

Cir. 2016).  Because the state court's habeas decision was unreasonable—thereby piercing AEDPA deference and prompting a de novo review—and because a de novo review reveals Maples's claims, if proven, would establish a valid *Strickland* claim, we hold that he is entitled to an evidentiary hearing on the matter.  *See id.* at 1248, 1261, 1280–81 (ordering an evidentiary hearing on a petitioner's *Strickland* claim after an Alabama state court unreasonably dismissed the petitioner's Rule 32 petition on the pleadings).  We address each point in turn.

## A.

The state habeas court's decision that Maples's allegations, if true, could not establish a valid penalty-phase mitigation claim was unreasonable under § 2254(d).  The decision was based both on an unreasonable determination of facts, *see* 28 U.S.C. § 2254(d)(2), and an unreasonable application of clearly established law, *see* 28 U.S.C. § 2254(d)(1).  Not only did erroneous factual conclusions based on the wrong Rule 32 petition permeate the court's decision, but the court also conducted a splintered and fragmented prejudice analysis, contrary to *Strickland*'s directives.

### 1.

The state habeas court's "adjudication of [Maples's penalty-phase mitigation] claim . . . resulted in a decision that was based on an unreasonable determination of the facts" because the court, in adjudicating the claim, relied on

6

the wrong Rule 32 petition. *See* 28 U.S.C. § 2254(d)(2). The court was required to determine the facts governing Maples's claim by examining his operative Rule 32 petition—his amended Rule 32 petition—and accepting as true the allegations therein. *See Daniel*, 822 F.3d at 1261. Instead, the court determined the governing facts by examining Maples's *initial* Rule 32 petition; thus, all of the new and more detailed allegations in the amended petition were ignored. In Maples's amended Rule 32 petition detailing his mitigating evidence, he not only alleged specific details about his depression, suicide attempts, mental health issues, head trauma, and good character, but he also identified multiple persons who could have testified accordingly.

For example, although Maples alleged specific details about his depression and suicide attempts, and named multiple persons who could have testified about the details, the state habeas court concluded that Maples failed to identify any details about his depression. And, even though Maples alleged that the director of his drug-addiction program, Kathy Goodwin, could have testified about his addiction and mental health issues, the court found that Maples did not identify anyone from the program who could testify about his addiction and mental health issues.

Similarly, the state habeas court made unreasonable factual determinations about Maples's head-trauma allegations. In his amended Rule 32 petition, Maples

7

alleged that but for trial counsel's deficient performance, his stepmother would have testified that he suffered head traumas that required emergency medical treatment, including a fall off a 20-foot cliff. The state habeas court nonetheless concluded that Maples identified no specific instances of head trauma about which his stepmother would have testified. This same error is true for the state habeas court's determinations about Maples's good-character allegations. In his amended Rule 32 petition, Maples named several friends, a guidance counselor, and a high school football coach who could have testified about his history of good character. But the court concluded that Maples did not identify by name any educators or friends who could have testified about his character.

Although § 2254(d)(2) imposes a high bar for showing an unreasonable determination of facts, we have little trouble concluding that Maples has overcome that bar. The state habeas court did not merely misconstrue a few facts in the record; the court—in a capital case—relied on the wrong set of facts. And that error led to a decision based on factual conclusions that cannot be reconciled with the record.[6]

2.

---

[6] At oral argument, the State contended that Maples cannot rely on § 2254(d)(2) to establish that the state habeas court's decision was unreasonable because the decision was a summary decision and did not include factual determinations. We disagree. The decision was not a summary decision devoid of factual determinations. It was 86-pages long, and it made reasoned conclusions about Maples's pleaded facts.

The state habeas court also unreasonably applied clearly established federal law, *Strickland*, because the court "failed to consider the prejudicial effect of trial counsel's deficient performance based on the totality of available mitigating evidence." *See Daniel*, 822 F.3d at 1277 (internal quotation marks omitted); *Williams v. Taylor*, 529 U.S. 362, 397–98, 120 S. Ct. 1495, 1515 (2000). In considering Maples's penalty-phase mitigation claim, the court impermissibly "broke up [the] claim into different subparts, then analyzed them separately." *See Daniel*, 822 F.3d at 1278. It examined Maples's allegations paragraph by paragraph, treating individual paragraphs (or, in some instances, small groups of paragraphs) as distinct subparts. Only in analyzing each subpart in isolation did the court find that none of the subparts include allegations that would support a finding of prejudice; it never considered the combined effects of the allegations.

For example, in evaluating Maples's allegation that his brother could have offered helpful good-character evidence if trial counsel had called him as a witness, the court analyzed it alone, in a vaccum:

> In paragraph 126, Maples alleges that Daniel Maples, his half brother, would have testified that [Maples] was a fun, loving brother who respected his father and did what he was told . . . . Maples has failed to proffer the [c]ourt any evidence that testimony from his half brother would have produced a different result in the penalty phase of trial.

9

Because of this splintered prejudice inquiry, "the [court] never considered what would be the combined effect of all mitigating evidence in producing a different outcome at sentencing." *See id.* Therefore, the court unreasonably applied *Strickland.* *See id.* ("[I]t is the reweighing of the totality of mitigating evidence that is important for reweighing under *Strickland.*"); *Williams*, 529 U.S. at 397–98, 120 S. Ct. at 1515.

## B.

And because the state court's determinations were unreasonable under § 2254(d), we now review Maples's petition de novo—where, notably, we are unrestrained by AEDPA's "formidable barrier to federal habeas relief." *See White v. Wheeler*, 577 U.S. ___, ___, 136 S. Ct. 456, 460 (2015).

*Strickland*'s deficient-performance prong requires Maples to show that his trial counsel's performance at the penalty phase "fell below an objective standard of reasonableness and was outside the wide range of professionally competent assistance." *See Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 928 (11th Cir. 2011) (internal quotation marks omitted). The prejudice prong requires Maples to show that "but for [the] deficient performance, there is a reasonable probability that the result of [his penalty-phase] proceeding would have been different." *Id.* at 928–29. To be clear, *Strickland* does not require certainty that the result would have been different, only a reasonable probability. *See Strickland*, 466 U.S. at 694,

104 S. Ct. at 2068; *Hardwick v. Crosby*, 320 F.3d 1127, 1160–61(11th Cir. 2003). And a reasonable probability is simply a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. In determining whether there is a reasonable probability of a different result, we must "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding"—and "reweigh[] it against the evidence in aggravation." *Williams*, 529 U.S. at 397–98, 120 S. Ct. at 1515. If this reweighing shows "a breakdown in the adversarial process that our system counts on to produce just results," such that the proceeding was "fundamentally unfair," then we must vacate the death sentence. *Strickland*, 466 U.S. at 696, 700, 104 S. Ct. at 2069, 2071.

Here, Maples's allegations, if true, amount to a valid *Strickland* claim.

1.

First, the allegations in Maples's amended Rule 32 petition, if true, amount to deficient performance under *Strickland*. In the petition, Maples asserts that, among other things:

- Before Maples's case, trial counsel had never assisted with a capital penalty phase.
- Trial counsel's entire mitigation investigation consisted only of briefly speaking to Maples's father and stepmother and hiring a psychologist, Dr. Allen Shealy, who only met with Maples for a few hours. Trial counsel did not contact any other individuals, despite Maples's father and stepmother recommending several potential mitigation witnesses by name, including: neighbors, teachers, friends, and relatives. Trial counsel also neglected to

11

request Maples's educational and medical records.    Further, trial counsel failed to provide Dr. Shealy with more thorough information about, among other things, the abuse Maples suffered as a child, Maples's struggles with drug addiction, and Maples's past suicidal ideation, thereby jeopardizing the thoroughness of his assessment.

- Trial counsel conducted this cursory investigation despite their awareness that Maples had a history of personal trauma that warranted additional investigation.  For example, trial counsel were in possession of Maples's application to a drug-addiction program which indicated that Maples struggled with addiction and multiple suicide attempts.  Yet, trial counsel did not contact any of Maples's counselors from the program—not even Kathy Goodwin, the director of the program who interviewed Maples for admission to the program.

- Trial counsel offered just four witnesses at the penalty phase:  Dr. Shealy, Maples's father, Maples's stepmother, and Maples's uncle—and wholly failed to prepare them for their testimony.  In fact, trial counsel did not even inform the majority of the witnesses—Maples's stepmother, father, and uncle—prior to trial that they would even testify; counsel told them during a break in the trial that they would testify.

- And when trial counsel did put the mitigation witnesses on the stand, he elicited limited, scattered mitigation evidence.  The testimony from Maples's father, stepmother, and uncle was superficial at best.  And Dr. Shealy's testimony was not only based solely on his short discussion with Maples, without the benefit of any educational, medical, or other records provided by the defense, but was also confusing and misleading.

These allegations show that trial counsel "failed to conduct a minimally adequate mitigation investigation" and that trial counsel's preparation for Maples's penalty-phase presentation "fell below an objective standard of reasonableness."  *See Daniel*, 822 F.3d at 1262, 1268 (internal quotation mark omitted).

First, based on the allegations, the scope of trial counsel's mitigation investigation was unreasonable.  Trial counsel "unreasonably decided to end the[ir]

12

. . . investigation after only talking to" Maples's father, Maples's stepmother, and Dr. Shealy. *See Cooper v. Sec'y, Dep't of Corr.*, 646 F.3d 1328, 1351 (11th Cir. 2011). "[P]otentially powerful mitigating evidence stared [trial counsel] in the face," such as Maples's suicide attempts, but they ignored the evidence, failing to take any steps to pursue it. *See Bobby v. Van Hook*, 558 U.S. 4, 11, 130 S. Ct. 13, 19 (2009). Trial counsel requested neither Maples's medical records nor his educational records. They also failed to contact Maples's drug-addiction program or a single person from the laundry list of people whom Maples's father and stepmother named as potential witnesses. "[A]ny reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice" about penalty-phase strategy. *See Williams v. Allen*, 542 F.3d 1326, 1340 (11th Cir. 2008) (internal quotation mark omitted).

Second, based on Maples's allegations, trial counsel's preparation for the penalty-phase presentation was unreasonably cursory. In light of Maples's videotaped confession, trial counsel had "every expectation that [Maples would] be convicted and w[ould] be facing a death sentence." *See Johnson*, 643 F.3d at 932. Trial counsel knew from the outset that Maples's life depended on the penalty-phase presentation. Yet they (1) waited until midway through trial to inform Maples's family members that they would be testifying and (2) failed to prepare any of the penalty-phase witnesses for their testimony. No reasonable attorney

13

who knows his client's life depends on the penalty-phase presentation would devote such minimal effort to preparing the presentation.

## 2.

Furthermore, the allegations in Maples's amended Rule 32 petition, show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result in the proceeding would have been different." *Williams*, 542 F.3d at 1342. The result we reach is guided both by the de novo standard of review and *Strickland*, which emphasized that "the ultimate focus of the inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Strickland*, 466 U.S. at 696, 104 S. Ct. at 2069. To this end, we must ask whether "the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.* With *Strickland* as our guide, reexamining in combination *all* of the evidence—that adduced in Maples's penalty phase and that alleged in his amended Rule 32 petition—de novo, and considering that Maples was only one vote away from a life sentence even without this additional mitigating evidence, we are unconvinced that Maples's trial produced a reliable, just result.[7]

---

[7] This is so despite the fact that Maples's trial counsel presented a case in mitigation, including relatively lengthy testimony by Dr. Shealy that included some examples of the physical abuse Maples suffered as a child. Dr. Shealy was engaged only to evaluate Maples's fitness for trial, trial counsel failed to prepare him adequately for the evaluation with any records or other information, and his entire evaluation consisted of a single four-hour interview with Maples. The quantity of Dr. Shealy's testimony, although relevant to our prejudice analysis, does not

In his amended Rule 32 petition, Maples alleged that he was prejudiced by his trial counsel's deficient performance because, among other things:

- Due to the deficient performance, the jury did not hear evidence that Maples's birth mother: has a mental illness; routinely threw violent, self-mutilating tantrums; stabbed Maples's father once while he was driving; attempted to slit the throat of Maples's father; once tried to sell Maples to a neighbor; and once left Maples in a car for hours when he was a toddler.

- Due to the deficient performance, the jury did not hear evidence that Maples cried for his birth mother, who had abandoned him in childhood, until his early teenage years and that Maples's stepmother had to sit with him at night while he was growing up because of his nightmares. The jury also did not hear evidence that Maples's birth mother emotionally abused him again in his late teenage years. Specifically, the jury was not able to fully appreciate Maples's encounter with his mother at age 17, where she again neglected him, verbally abused him, and after just a few months abandoned him once more—an event that deeply hurt him and launched him into a period of drug abuse. Underscoring the extent to which this episode of abuse affected Maples, he dropped out of high school during the time that he lived with his mother.

- Due to the deficient performance, the jury did not hear evidence that, in the years leading up to his crimes, Maples suffered from serious depression and suicidal ideation. Maples wrote poetry about depression and loneliness; once wrote a suicide note and then hid in the woods; and took anti-depressants in jail prior to trial. Nor did the jury hear evidence that *Maples attempted suicide on three separate occasions by* (1) taking over thirty sleeping pills, drinking a bottle of alcohol, and crashing a family member's car; (2) playing Russian roulette (he put a gun in his mouth and pulled the trigger); and (3) slashing his wrists with a butcher knife.

---

change our task—reweighing all of the evidence anew. To the extent some of the new mitigating allegations in Maples's amended Rule 32 petition could be characterized as cumulative, that characterization goes to the weight of the evidence, not to whether we consider it at all. And for the reasons we explain below, after we reweigh de novo the totality of the evidence in mitigation against that in aggravation, we cannot say we have confidence in the outcome of Maples's penalty phase proceedings.

15

- Due to the deficient performance, the jury heard only a few scattered statements about Maples's good character, even though Maples had lifelong, positive relationships with friends and family members; looked after his younger brother, discouraging him from using drugs; acted in an undercover capacity to assist police officers with arresting a drug dealer; never had disciplinary issues in school; was regarded as a respectful young man by school staff; was active in extracurriculars as a youth, including church and high school sports; and had a record of good behavior in jail during the two years leading up to trial.

- Due to the deficient performance, the jury also did not hear evidence that Maples has a history of head trauma.  Maples once fell off a 20-foot cliff as a teenager and was struck in the head with a bat about a year before his crimes.

These new and more extensive allegations identify powerful, more in-depth mitigation evidence, and establish a reasonable probability that, but for trial counsel's deficient performance, the result of Maples's penalty-phase proceeding would have been different.

We are unpersuaded that the new mitigation evidence would have been a "double-edged sword" if it had been presented.  The State had already harped on some of the damaging aspects of Maples's past.  And even then, the jury *still* narrowly voted for death; this new evidence would have helped far more than it would have hurt.

We are equally unpersuaded that the new mitigation evidence is merely cumulative; especially when evidence of the suicidal ideation and the head traumas was completely left out.  Furthermore, the gravity of the abuse and personal trauma that Maples experienced was not accurately depicted.  Trial counsel offered no

16

evidence of Maples's *multiple* suicide attempts and suicidal ideation. Trial counsel offered no evidence of Maples's serious and grave depression. Trial counsel offered no evidence of Maples's head traumas. Trial counsel offered no evidence about Maples's history of nightmares. Trial counsel offered little to no evidence exploring the abuse that Maples's birth mother subjected him to when he was 17 years old. And trial counsel failed to fully bring evidence of Maples's good character to light, which could have shown the jury that Maples tried to be a good person despite his traumatic childhood, adolescence, and ongoing resulting mental health problems.

The evidence actually offered by trial counsel compared to the evidence that was available, merely scratched the surface of the kind of trauma Maples suffered. And even if a portion of the new evidence is cumulative in a sense, its relevance or strength is not undermined when it is considered and reweighed with all of the evidence. This is especially true here since the allegations in the amended Rule 32 petition are considerably more detailed and substantive than what was actually presented. All things considered, the quality of the mitigation evidence is important.

Here, we are tasked with reweighing all of the aggravating and mitigating circumstances as a whole. And in doing so, we are hard pressed to conclude that

17

there is *no* reasonable probability that a jury would have recommended a life sentence over the death penalty.

Indeed, the impact of evaluating the totality of the evidence is even more striking considering that it need only sway one more juror.  And the probability that one more juror would have been moved to vote for life over death is further compounded by the limited aggravation evidence in this case—the state trial court found only one statutory aggravating factor applicable here.  *See Williams*, 542 F.3d at 1343 ("Further supporting a finding of prejudice is the fact that this case is not highly aggravated.  It is well established that 'a [sentence] only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'"  (quoting *Strickland*, 466 U.S. at 696, 104 S. Ct. at 2069)).  Again, even with trial counsel's cursory mitigation presentation, two jurors *still* voted against the death penalty: just one vote shy of enough votes to preclude a jury recommendation of death.  *Id.*; *See* Ala. Code § 13A-5-46(f); *Daniel*, 822 F.3d at 1276 & n.20.  Under these circumstances, there is a reasonable probability that Maples's new evidence—evidence that could have altered his sentencing profile—would have shifted the life-versus-death balance.  *See Williams*, 542 F.3d at 1343.

Because the evidence offered by trial counsel lacked so many important data points about Maples's background and character, the trial judge and jury could not

18

"accurately gauge [Maples's] moral culpability." *See Porter v. McCollum*, 558 U.S. 30, 41, 130 S. Ct. 447, 454 (2009) (per curiam). These powerful pieces of evidence could have altered Maples's sentencing profile, painting a different, more compelling picture of him. The mitigation evidence that was actually presented painted a picture of Maples as someone who was abused as a child but suffered no real continuing effects from the abuse, got mixed up with drugs as an adult, and made bad decisions solely as a result of his drug addiction. But when accounting for Maples's new evidence, the *totality* of the mitigation evidence paints a different picture of Maples as someone with life-threatening mental health issues who has experienced lasting, ongoing trauma due to his birth mother's abuse and rejection, and who, despite such issues, tried to lead a productive life. Thus, it is reasonable to conclude that the evidentiary scales would have been tipped, yielding a sentence of life rather than death. Essentially, we cannot in good conscience refuse to acknowledge that there could have been a different result here.

### III. PROCEEDINGS ON REMAND

After conducting an evidentiary hearing,[8] the district court shall make factual findings and conclusions of law as to whether Maples has shown actual prejudice to excuse his procedural default of his penalty-phase mitigation claim in state court, as set forth in *Maples*, 565 U.S. at 280, 289–90, 132 S. Ct. at 922, 927–

---

[8] Of course, in addition to holding the evidentiary hearing, the district court may order discovery if appropriate.

19

28.  If the court concludes that Maples has shown actual prejudice, the court shall rule on the merits of the penalty-phase mitigation claim.  Since we have determined that the state habeas court's decision was unreasonable, the district court "is no longer bound by § 2254(d) or limited to consideration of the facts developed in the state [habeas] court record when evaluating the merits of [Maples]'s claim."  *See Daniel*, 822 F.3d at 1280.  The district court should review Maples's claim de novo.  *See id.* at 1282.

**VACATED AND REMANDED.**

HULL, Circuit Judge, dissenting:

Cory R. Maples, an Alabama death-row inmate, appeals the district court's denial of his 28 U.S.C. § 2254 amended petition for writ of habeas corpus.  In this appeal, Maples's sole claim is that his trial counsel was ineffective in the investigation and presentation of <u>mitigating evidence</u> during the penalty phase of his 1997 trial.

After conducting <u>de novo</u> review, the district court ruled that Maples has not shown (1) the required prejudice to excuse his procedural default or (2) <u>Strickland</u>[1] prejudice.  There was no evidentiary hearing in state or federal court, and thus the district court accepted all of Maples's well-pleaded allegations as true.  Because of certain concerns about the state collateral proceedings, the district court conducted <u>de novo</u> review.  Without deciding deficient performance, the district court concluded that Maples had not shown prejudice because: (1) his trial counsel had presented extensive mitigating evidence at trial; (2) his new evidence was either cumulative or, at best, weak mitigating evidence; and (3) given the totality of the aggravating and mitigating evidence, Maples had not show a reasonable probability that his new evidence would have changed the outcome of his penalty trial.

---

[1] <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052 (1984).

I agree with the district court and conclude that precedent requires us to affirm its ruling that Maples has not shown prejudice and its denial of his amended § 2254 petition.

Because a prejudice inquiry requires consideration of both aggravating and mitigating circumstances, I review the aggravating nature of Maples's admitted murders and the extensive mitigating evidence his counsel presented at trial.  I then outline the district court's comparison of the trial and new mitigation evidence, and why it concluded Maples had not established prejudice.  Lastly, I explain why I agree with the district court that  Maples has not shown prejudice.

## I.  1995 MURDERS

Defendant Maples robbed and brutally murdered his two friends, Stacy Terry and Barry Robinson, so that Maples could steal Terry's red Camaro.[2] Maples confessed and has never denied that he shot both young men twice in the head during his robbery of Terry's Camaro.  The Alabama Court of Criminal Appeals described the "execution-type slaying" as follows:

> At some time in the late evening hours of Friday, July 7, 1995, or the early morning hours of Saturday, July 8, 1995, Stacy Alan Terry,

---

[2]Throughout the record, various parties' names have multiple spellings.  Appellant Maples's first name is spelled either Cory or Corey.  His father's name is spelled Philip or Phillip.  A friend, Mr. Birdsong's, first name is spelled either Alan or Allen.  And the testifying psychologist's first name is also spelled either Alan or Allen, and his last name is spelled both Shealy and Shealey.  For clarity's sake, I will use one spelling of each of these names throughout this dissent.

Barry Dewayne Robinson II, and the Defendant, Corey Ross Maples, arrived at the residence of the Defendant on Mud Tavern Road in Morgan County[, Alabama].   All three of the young men were acquaintances.   Mr. Terry, whose nickname was Twinky, and the Defendant had spent the evening of July 7 drinking, playing pool, and "riding around" in Mr. Terry's 1995 Camaro.  The Defendant and Mr. Terry had attended high school together until the Defendant dropped out his senior year. As evidenced by the testimony of family and friends, the two young men had spent a considerable amount of time together during the week preceding these events.

Mr. Robinson was new to the area, but had known Mr. Terry and the Defendant for several months.  Mr. Robinson asked Mr. Terry for a ride home from the pool hall where all three young men were playing pool.

Once the three young men arrived at the home of the Defendant, Corey Maples, [Maples] left the car and went into the mobile home. The [D]efendant picked up a .22 caliber rifle and walked back outside to the car where Mr. Terry and Mr. Robinson sat getting ready to leave.  The Defendant walked to the driver's side of the car and shot Mr. Terry twice in the head and then shot Mr. Robinson twice in the head.

. . . .

Mr. Terry and Mr. Robinson died as a result of gunshot wounds to the head.  Both young men were shot twice in the head. . . .  The wounds were consistent with an execution-type slaying.  The evidence proved beyond a reasonable doubt that the Defendant shot both men.  He was armed with a .22 caliber rifle which belonged to his father.

Maples v. State, 758 So. 2d 1, 14–15 (Ala. Crim. App. 1999).   After executing his friends, Maples left Terry's body lying in the driveway and dumped Robinson's body in a nearby creek.  The state court pointed out where the bodies were found, stating:

23

> At some time around 1:00 a.m. on July 8, 1995, the Defendant's half-brother, Daniel Maples, and his friend, Matt Shell, arrived at the residence on Mud Tavern Road and found the body of Stacy Terry lying in the driveway close to the trailer where the Defendant and his half-brother lived with their father and the Defendant's stepmother.

> At some time around 9:00 p.m. on July 8, 1995, the Decatur police received a report of a body found in a creek commonly referred to as Mud Tavern Creek, one mile down the road from the Defendant's residence. The body was identified as that of Barry Robinson II.

Id. at 15. After learning that Maples killed the victims, the police found Maples in a motel in Nashville, Tennessee a month later, still in possession of Terry's red Camaro. Id.

The 1995 indictment charged: (1) that Maples, pursuant to one course of conduct, did intentionally murder Stacy Terry and Barry Robinson by shooting them with a rifle (Count I); and (2) did intentionally murder Terry while Maples was in the course of committing the theft of Terry's 1995 Chevrolet Camaro automobile (Count II). Given the overwhelming evidence of guilt and Maples's confession, the jury convicted Maples of the capital murders.

## II.  PENALTY PHASE

The State did not present any evidence during the penalty phase. Instead, Maples's trial counsel presented extensive mitigating evidence from these four witnesses: Dr. Allen Shealy and family members Elyse, Kenneth, and Phillip Maples.

24

The mitigation evidence fell into these four categories: (1) Maples's birth mother's abuse and neglect of Maples from birth to age three; (2) his alcohol and drug abuse and his attempts to overcome them by attending Quest Rehab; (3) his assistance to law enforcement in a drug case; and (4) the care and high regard Maples's family and friends had for him. As to these categories, I detail the trial mitigation evidence and later compare it to Maples's new mitigating evidence (i.e., his factual allegations in the amended collateral petitions, which the district court accepted as true and proven for purposes of its prejudice ruling).

### III.    MITIGATION EVIDENCE AT 1997 TRIAL

#### A.    Dr. Shealy

At defense counsel's request, the state trial court ordered that a doctor from the State's medical facility evaluate Maples to determine (1) his mental state at the time of the murders and (2) his competence to stand trial. Importantly, as to the mitigation issue here, defense counsel also asked for and obtained funds to retain the separate services of psychologist Dr. Allen Shealy, noting that such assistance would be vital to proving mitigating circumstances during the penalty phase of trial.

Dr. Shealy has impressive credentials, including a Ph.D. in clinical psychology, certifications from the Alabama Board of Examiners in Psychology and the American Board of Examiners in Professional Psychology, and was the

author of numerous scholarly articles and publications.  At the time he interviewed Maples in 1997, Dr. Shealy had served: (1) as a professor at the University of Alabama's medical school (in the departments of psychiatry and psychology) and/or the University of Alabama's department of criminal justice for almost thirty years; (2) as the director of psychology at an Alabama hospital for eight years; and (3) in clinical private practice for fifteen years.

Dr. Shealy's evaluation consisted of "an extensive interview and history and mental status exam" along with the administration of tests to gauge Maples's intelligence, personality, psychoneurological deficits, and reading level.  Dr. Shealy testified that he gave Maples: (1) the Wechsler Adult Intelligence Scale ("WAIS") test, which is the "most reliable measure of intelligence"; (2) the Minnesota Multiphasic Personality Inventory ("MMPI"); (3) projective testing (e.g., showing people drawings, ink blots, etc., and "asking what their perceptions are and comparing that to other people"); and (4) the Wide Range Achievement Test ("WRAT") to gauge reading level.  According to Dr. Shealy, these tests are widely used among psychologists, and he performed them as part of "a complete psychological evaluation" of Maples.  As discussed later, Maples had average intelligence but could read at a college level.

Dr. Shealy spent four to five hours with Maples.  Prior to the evaluation, Maples's lawyers provided Dr. Shealy with "some background" information.  Dr.

26

Shealy determined that Maples was oriented in person, time, place, and circumstances.

During the evaluation, Dr. Shealy had Maples describe his recollection of the murders and the events leading up to them. Maples told Dr. Shealy that he had attended drug rehab at Quest Treatment Center a year or so before the murders and, prior to that, was using a host of illegal drugs. Maples acknowledged to Dr. Shealy that "beginning at about age seventeen and for about three years he was using marijuana, cocaine, LSD, he had used heroin once, he had used Ecstasy, various pills, crack cocaine, methamphetamine, PCP, and something called Crank."

Dr. Shealy had Maples describe his use of alcohol and drugs, noting Maples's "lack of memory for the events." Dr. Shealy explained to the jury: (1) that there are certain drugs and combinations of drugs and alcohol that would make it difficult for Maples to recall events; (2) that he was thus interested in knowing what "chemical state" Maples's brain was in at the time of the murders, including the type and amount of substances Maples had ingested; and (3) he wanted to know roughly how much alcohol Maples had that night and if Maples had smoked marijuana or taken any other drugs in order to "see what the mix was."

Maples told Dr. Shealy that he was drinking steadily for approximately ten hours before the shootings—he started at around 2:00 that afternoon, had seven or eight beers in the early evening, four to five more beers at Terry's sister's house,

27

and then "seven or eight mixed drinks" at the Caddy Shack.  Maples also smoked a joint of marijuana at 3:00 that afternoon.  Maples stopped drinking at 10:00 p.m. when he and Terry went to the pool hall.  They left the pool hall with Robinson around midnight.  Terry told Maples that they had to give Robinson a ride home, and Terry dropped Maples off first.

Maples told Dr. Shealy that "his memory started getting fuzzy when he came out of the house that night.  [Maples] didn't remember what made him come outside after he went in the house after he was dropped off there."  Dr. Shealy testified that Maples told him the following details about the murders.

Maples remembered that Terry dropped him off at home, and Maples told Terry to call him the next day "and they would play golf or something."  Maples got out of the car and had some trouble finding his keys or fumbled for his keys, but he eventually got into the house.

Once inside the house, Maples: (1) "opened his parents' bedroom door because he knew he could see the car from there"; (2) saw the car was still in front of the house and saw Robinson standing up outside the car; and (3) observed that "it was a low built car, and [Robinson] was slouched over like he was looking into the car and had his head inside the door."  Maples told Dr. Shealy that the next things he remembered were: (1) "seeing Twinky [Terry] with his head laid back in the seat" and he remembered a lot of blood on the side of Terry's face; (2) "putting

28

the gun down, . . . going up to the car, Twinky being in the passenger seat and [Robinson] being half in and half out of the car"; and (3) "checking both of their pulses and realiz[ing] that they both were dead."

Then Maples told Dr. Shealy that he: (1) "kind of freaked out and didn't know what to do so he pulled Twinky [Terry] out of the car, checked his pulse again"; (2) he "stood there for two to three minutes trying to figure out what to do"; (3) he "thought about calling the police but he knew they would arrest him whether he left or whether he didn't"; (4) he "couldn't pick up Twinky [Terry] because he was too heavy, so he left him"; and (5) he put Robinson "the rest of the way in the car and drove back towards Decatur and came to a creek and knew he couldn't ride around with a body in the car, so he threw the body in the creek."

Dr. Shealy asked Maples if he had experience with traumatic situations, and Maples replied that he had found a friend of his dead in 1994 or 1995. Maples "was the first one on the scene of a car accident, and . . . it looked like [the friend's] head had been cut off." In 1992, Maples came upon another car accident and saw a girl's lifeless body. This shocked him because "her face was particularly torn up."

While Dr. Shealy said it was "hard to say with any specificity" how much alcohol and/or drugs Maples had consumed prior to the murders, he thought "it was clear that [Maples] wasn't so intoxicated that his memory was totally wiped

29

out because he remembered the details of what happened before such as getting out of the car and looking for his keys. He [Maples] remembered the details afterwards in terms of checking the pulses."

From these facts, Dr. Shealy formed several hypotheses, including: (1) Maples had a "dissociative experience where he blocked out that part from his memory which would have been perhaps contributed to by the intoxication; the alcohol and drugs"; or (2) "because of his heavy hallucinogenic drug usage, LSD and so forth, it could have been a dissociative experience related to a flashback." Maples had told Dr. Shealy that he previously had experienced "several bad trips and one flashback" while he was using LSD in 1992 or 1993.

During the evaluation, Dr. Shealy questioned Maples about his family history. Maples had a "good relationship" with his father (Phillip Maples), but Maples reported that his birth mother was abusive and neglectful. Maples's birth mother "beat him a lot." His birth mother even tied Maples to a chair and whipped him with a broom handle. Maples told Dr. Shealy that his birth mother was "crazy." His birth mother had stabbed his father and poured hot grease on his father while he was sleeping. When Maples would stay with his grandmother on the weekends, Maples would arrive with "fingernail marks on his neck and bruises on his body from his mother's abuse." When his grandmother later told him about these incidents, Maples "got angry and wondered what he had done to cause it."

30

According to Maples's grandmother, his mother "had run away with him at one time to Pennsylvania."

When Maples was three years old, his birth mother and father divorced, and his mother moved away. Maples did not see his mother again until he was 17 or 18 years old, when he went to live with her briefly. At age 17 or 18, Maples lived with his mother for only two to three months and described her as "easily angered." Maples said "he had a lot of questions he wanted to ask her, why after fifteen years of no contact, why she wanted to see him now."

When Maples was four years old, his father, Phillip, remarried. Maples told Dr. Shealy that "he always got along with [his stepmother Elyse] real good all in all." Maples related that his father was the disciplinarian, "that discipline was being whipped with a belt when he was younger and as he became older it was being grounded or having restrictions placed on him." Maples did say that his father "got drunk" when Maples was young.

Maples performed well academically and got along with his classmates throughout grammar school and junior high school. Maples began smoking marijuana when he was 11 or 12 and started drinking alcohol when he was 13. His parents "stayed on him" about his grades and his friends. Although he had been in advanced academic classes when he was younger, Maples (at age 18) dropped out of school in 12th grade in 1992.

31

Dr. Shealy said that there was "[n]othing remarkable" about Maples's history of romantic relationships "except perhaps sexual relations beginning at age fourteen." Dr. Shealy opined that Maples's romantic relationships were "not a major factor in terms of understanding his psychological and emotional involvement and personality involvement."

Dr. Shealy asked about Maples's friendships and learned that Maples's "best friend in growing up," Kenneth, had slept with Maples's girlfriend. Maples admitted that he later "got even with" Kenneth during a drug deal. Dr. Shealy asked about Maples's relationship with Jamie Dobbs, who Maples met in 1993 and who introduced Maples to cocaine. Dobbs had a "big inheritance" and the two men spent their time partying and doing drugs. In addition, Maples had "spent a lot of time on the street." According to Maples, the spring of 1993 to the beginning of 1994 "were the street days and heavy drug use days." The murders were committed in July 1995, after Maples was released from drug treatment at the Quest rehab facility in January 1995.

Dr. Shealy explained to the jury how Maples's abusive and neglectful mother had a long-lasting effect on Maples. Dr. Shealy testified that the abuse and abandonment Maples's mother inflicted on him occurred at a very vulnerable age. Because infants are totally dependent on their mothers, an abusive mother "has a lot of long-term effects on people." Dr. Shealy emphasized that "[c]hildren who

32

have been abused or neglected or abandoned during early childhood are much more likely" to rebel against authority, "act out in some antisocial ways," and abuse drugs and alcohol. Substance abuse, he explained, was a common tactic to numb the emotional pain of the mother's abuse. Dr. Shealy said this was Maples's story—an abused child growing into "a man of the streets . . . somebody who had taken the tough guy position." In Dr. Shealy's opinion, Maples had feelings, but he would numb them or pretend they did not exist.

Dr. Shealy also interviewed a police officer, Officer Frost, who worked at the jail where Maples was held. Officer Frost was friends with and knew Maples in high school. According to Officer Frost, Maples played varsity football and baseball in high school. Maples was not a troublemaker at school but was, rather, a "perfectionist" who was concerned about his image. In 1992, when Maples was 18, he dropped out of school and was denied entry to the Army due to a failed drug test. This, according to Dr. Shealy, was the start of Maples's "downfall."

According to the tests performed by Dr. Shealy, Maples was of average intelligence but could read at a college level. Dr. Shealy commented that it was "unusual" for a defendant's achievement level to surpass his intelligence, and this suggested that Maples had "applied himself and been a good student." It also fit with Officer Frost's description of Maples as a perfectionist.

33

Dr. Shealy also performed a personality test on Maples by having Maples answer 566 true/false questions and then feeding the answers into a computer program, which in turn generated results.  Based on the computer program, the Axis II[3] "diagnosis" was "passive aggressive personality disorder."  Dr. Shealy testified that the lower-level "diagnostic impressions" generated by the personality test were "adjustment disorder with depressed mood," "[o]rganic personal syndrome," "alcohol abuse and psycho active substance abuse," and "dissociative disorder."  Dr. Shealy said he did not find any evidence of brain damage.

Based on the computer program's results, Dr. Shealy explained Maples's personality disorder this way: "Many of these individuals control their anger most of the time at a great emotional expense.  That is, they are over controlled.  However, some may prove to be dangerous or unpredictable. . . .  If sufficiently provoked they can explode in an outburst of passion often seen as unexpected by those around them and violently assault their provoker and others present as well."  Dr. Shealy said that this diagnosis "fits with the evidence that during high school he [Maples] was very well behaved, he had a period of pretty intense acting out which related to substance abuse and alcohol abuse, and there was this

---

[3]"The Diagnostic and Statistical Manual of Mental Disorders ('DSM') organizes psychiatric diagnoses into several dimensions or axes: Axis I pertains to all psychological diagnostic categories except mental retardation and personality disorders, and Axis II pertains to mental retardation and personality disorders." Jones v. GDCP Warden, 815 F.3d 689, 709 n.3 (11th Cir. 2016).

34

perfectionistic pattern, over controlled, and probably a lot of seething anger underneath having to do with [his] early childhood experience of being abused."

Dr. Shealy told the jury that Maples's use of drugs and alcohol could be the "cue that would trigger something from the past.  It could be something in the present that could provoke an outburst."  Dr. Shealy explained to the jury that individuals with passive aggressive personality disorder "build an emotional wall around themselves" that can be eroded by substance abuse or intoxication.  Dr. Shealy stated that either a "sufficiently strong stimulus" or "some incapacitation as a result of intoxication" could provoke an outburst.  Dr. Shealy also explained that his diagnosis of passive aggressive personality disorder relates back to, and is a product of, the trauma in Maples's childhood because abused children "are likely . . . to act out."

Dr. Shealy's final opinion was that, given Maples's history and his alcohol and marijuana use during the ten hours or so before the murders, Maples was impaired in terms of his capacity to behave in a normal fashion or to conform his behavior to the requirements of the law.

As part of his preparation, Dr. Shealy also reviewed a report prepared by Dr. Lawrence Maier, a psychologist with the state department of mental health.  Dr. Maier performed a structured interview of Maples but did not conduct any psychological testing.  Dr. Maier found that Maples had "probable personality

35

disorder antisocial type" and "poly substance abuse," both of which are, according to Dr. Shealy, consistent with his own findings and conclusions.

During the State's cross-examination, Dr. Shealy admitted that there was not much difference between his diagnosis and Dr. Maier's. Dr. Shealy explained that both disorders involve anger, but one is expressed as "over controlled hostility" and the other is typically expressed towards others. Dr. Maier had not conducted any personality testing, but only interviewed Maples. Dr. Shealy said that, if he had not conducted the personality testing, he "probably" would have reached the same conclusion as Dr. Maier.

Dr. Shealy acknowledged that "the diagnostic impression of a passive aggressive personality disorder was a diagnostic impression arrived at by the computer program." But Dr. Shealy insisted that his own opinion was based not only on the computer results but also on Maples's history and his personal observations of Maples. For example, Dr. Shealy administered the Bender-Gestalt Visual-Motor test to Maples, and Dr. Shealy noted that Maples drew the figures in a very organized, precise, and exacting way, even erasing one drawing twice to get an angle exactly right. This suggested to Dr. Shealy that Maples was "not impulsive," but was "orderly, organized, careful, [and] conscientious." To Dr. Shealy, this meant that Maples was not someone who suffered from a "conduct disorder," or an "impulse control disorder," or even "chronic acting out."

36

B.    **Stepmother Elyse Maples**

Maples's stepmother, Elyse Maples, testified that Maples was a good and smart child who did not get into trouble and that his birth mother abused him. Elyse and Maples's father were married for 20 years and had one child together. Stepmother Elyse had known Maples since he was three years old. Elyse described him as a "typical kid" who was "very fun loving" and "enjoyed being around other kids a lot." Although Maples was "adventuresome" as a child and "liked to have his daddy's attention," "he wasn't somebody that got in trouble a lot." Elyse said that Maples was smart and did well in school. **[Id.]** He tested "above average" in kindergarten and was in advanced classes until the fourth grade. During those years, Elyse said that she had a good relationship with Maples. Elyse tried to be a mother to Maples as best she could.

When Maples was in sixth or seventh grade, his grades started falling. Based on Elyse's observation, Maples did not have a drug problem until after he came back from living with his biological mother when he was 17 or 18 years old. During the time that Maples lived with his mother, his mother abused him. His birth mother would call Elyse and say she did not want him at home "when her company came over." Elyse testified that Maples's mother called her "three weeks after she hadn't seen him any more and asked me if he came home and he hadn't,

37

so he was basically on the streets then." Maples initially would not return to his father and stepmother's home, so he "was actually on the street basically."

When Maples did return, Elyse noticed that he "would stay out until the early hours of the morning," and he was drinking and running with a crowd who were known for using drugs. Maples's father and stepmother tried several tactics to address their son's drug problem, but because Maples "didn't have any insurance and at the time was basically indigent," most treatment facilities would not accept him. Eventually, Maples sought drug treatment and was accepted at the Quest drug rehab center. That treatment ended in January 1995, and Elyse saw "a lot of improvement" in Maples.

Elyse testified that Maples "had worked with the Decatur city police to catch somebody with some drugs, and we had some threats—some telephone threats and we just didn't feel like [Maples] would be safe in the area so we moved him." At this point, Maples moved to his uncle's house in Tennessee.

Elyse stated that she had attended the trial and "[t]hat's not the Corey Maples I knew and it's still not the Corey Maples I know."

## C.    Uncle Kenneth Maples

Maples's uncle also testified. Kenneth Maples worked for the local fire department, and he was at the scene of the murders that night as part of his job. Kenneth testified that Maples was "okay" growing up. Kenneth confirmed that

38

Maples's birth mother abandoned Maples and the family.  Kenneth never saw

Maples's mother around him.  Kenneth agreed that Maples was "a pretty good

kid," that Maples "got messed up on drugs," and that Maples would not have

committed the crimes if not for "drugs in his life."

In addition to testimony that Maples was a good kid until he started abusing

drugs, trial counsel in the guilt phase had already presented testimony that Maples

was trustworthy.  During the guilt phase, Maples's lawyers called Allen Birdsong,

Maples's friend and former employer, who testified that Maples was trustworthy.

For example, Birdsong testified that Maples lived with him in Tennessee for a time

and worked for him doing cable T.V. installation.  Birdsong said that Maples was

with him when he cashed business checks for thousands of dollars, and Maples

knew Birdsong had three trucks.  Birdsong said he trusted Maples with his things.

## D.    Father Phillip Maples

Maples's father, Phillip Maples, testified last and gave vivid examples of

how Maples's birth mother physically and emotionally abused their son.  Phillip

described Maples's birth mother as "crazy" and "a nut case."  Phillip explained

that Maples's mother tried to kill Maples and him on "several different occasions."

Phillip testified that Maples's mother "beat [Maples] on several occasions, choked

him, left him in the car with the windows rolled up, slapped him, you know, just

crazy stuff."  Phillip stated that he was at work when the birth mother tied Maples

39

to a chair and beat him with a broom handle, and Phillip came home to find bruises and rope marks on his two-year-old son. That was the "final straw," and he divorced Maples's mother when Maples was 2 or 3 years old.

Phillip testified that Maples's mother viciously attacked him on several occasions by stabbing him, shooting at him, and pouring hot grease on him while he slept. Phillip explained that "[y]ou could be talking to her one minute and she would be fine and the next minute she was a whole other person in another world."

Phillip was "totally against" Maples going to live with his mother when Maples was 17. Phillip agreed with defense counsel that Maples's mother seemed to be ashamed of him because she kicked him out of the house when she had friends coming over and she never came to the trial.

Phillip admitted that he knew Maples drank "a little bit" as a teenager, but he did not realize Maples was using drugs at that time. After Maples went to stay with his birth mother, Phillip saw a change in his son. "[I]t was like his mind was wandering a lot," Phillip explained. Maples used to call his father and check in, but Phillip and Elyse "didn't hear from him more and more and more . . . and we heard from different people that the folks he was running around with . . . was well-known into drugs." Phillip reiterated that Maples eventually went to drug therapy, and it helped him. Phillip testified that his son was "a good kid." Phillip

said that Maples's birth mother was "just the woman that had him. . . . [Elyse] is his mother."

In addition to Dr. Shealy's and his family's testimony about Maples's substance abuse during the penalty phase, there had already been evidence of Maples's alcohol and substance abuse during the trial.

The trial evidence in the guilt phase revealed that Maples was drinking the night of the murders. In his written statement to police, Maples wrote that, several hours before the murders, he had "6 or 7 beers" but "didn't feel very drunk." Two women with Maples and Terry earlier that night testified that all four of them were drinking at the Caddy Shack, a local restaurant, although Maples did not appear drunk or high. The owner of the pool hall where all three men spent time that night testified that Maples had trouble getting out of the car when he arrived. Another witness from the pool hall testified that he did not know whether Maples was drunk that night, but that Maples was not shooting pool as well as normal and seemed "a little hyper." During the defense's case-in-chief, Maples presented evidence from two witnesses who said that, although he had been drinking that day, Maples did not seem intoxicated.

The State presented evidence that Maples was also using drugs that day. After killing Terry and Robinson in execution style, Maples drove to the home of Heather Davis and April Phillips. Phillips testified that Maples had drugs in his

41

hand and "kept asking" her if she wanted to "get messed up," (do drugs). Maples told her "he had been doing crystal meth and crack." After leaving Phillips's house, Maples went to the home of James Smith, a.k.a. "Fishbone," and tried to buy drugs. When Fishbone did not sell him drugs, Maples left with another man to "get some crack."

In a videotaped interview shown to the jury, Maples admitted to police his execution-style killings and that he smoked marijuana that night, but he denied consuming any hard drugs. In the video, Maples acknowledged having "seven or eight" beers and some liquor in the hours leading up to the murders. Later, Maples stated that he had between six and seven beers by the time he left a party at Terry's sister's house that night at about 7:30-7:45 p.m. Maples said he could tell he had had six beers, but he was not "starting to get drunk or staggering around or anything."

Maples told investigators that "personal problems" had been on his mind, but his anger and gloominess had nothing to do with the victims. Maples said drinking would exacerbate these negative thoughts. Maples said he would think about how he was a "screw-up," he was lonely, "things about my real mom," and he was down on himself because of problems he had caused his family.

42

### E.    Trial Counsel's Closing Stressed Multiple Mitigation Factors

At the close of the sentencing-phase evidence, Maples's trial counsel argued that the following mitigating factors warranted a life sentence: (1) Maples's lack of a significant criminal history; (2) Maples acted under the influence of extreme mental or emotional disturbance; (3) Dr. Shealy had testified that Maples's capacity to conform his conduct to the requirements of the law was substantially impaired; (4) Maples's age (21) at the time of the murders; (5) the abandonment, abuse, and neglect by Maples's birth mother; (6) Maples's past drug dependency; (7) Maples's attempts to control his drug addiction by going to a drug rehab program; (8) Maples's assistance to law enforcement; (9) Maples's diminished mental capacity at the time of the murders due to his consumption of alcohol; (10) Maples's display of remorse and candor and acceptance of full responsibility for his crimes in his videotaped confession to police; and (11) the fact that "the crime was absent of any prolonged suffering or torture."

## IV.  1997 SENTENCING

On October 31, 1997, the jury recommended death by a 10-2 vote.  At the November 21, 1997, sentencing hearing, the state trial court judge accepted the jury's recommendation and sentenced Maples to death on both murders.

In its November 21, 1997 sentencing order, the state trial court explained that the State had proven the existence of one statutory aggravating circumstance:

43

Maples committed the capital murder offense while engaged in the commission of a robbery of the victim's red Camaro. The state trial court also found the existence of one statutory mitigating circumstance: Maples had no significant prior criminal history.

The state trial court found that Maples's alcohol consumption on the night of the murders did not establish that Maples was so severely impaired that he could not appreciate the criminality of his conduct that night. Further, the court noted that Maples stole the vehicle of victim Terry and fled the state because he knew the authorities would be after him. The court found the evidence too unpersuasive to support the statutory mitigating circumstances of (1) Maples being under extreme mental or emotional disturbance or (2) substantial impairment of Maples's capacity to conform his conduct to the requirements of the law.

The state trial court acknowledged Dr. Shealy's diagnosis of a passive-aggressive personality disorder caused by his birth mother's abuse of Maples and that Dr. Shealy had testified that alcohol and past drug abuse might be a trigger for Maples's actions on the night of the murders. And the state trial court discussed how Maples had presented seven additional mitigating circumstances, on top of those listed in the statute.

First, the state trial court did not doubt that Maples was abused and abandoned by his birth mother. Maples's evidence proved that Maples "is a

44

troubled young man with a history of abuse from his mother and self-abuse through drugs and alcohol."

Second, the state trial court acknowledged that the trial testimony established that Maples had a "drug dependency" on a host of illegal drugs and "has suffered from addiction to various controlled substances."

Third, the state trial court credited the testimony from Phillip and Elyse Maples that Maples had tried to stop using drugs and had attended drug rehab.

Fourth, as to Maples's cooperation with police, the state trial court noted that Maples's stepmother testified that Maples had assisted the city police "in apprehending a drug violator."

Fifth, Maples had presented his "diminished mental capacity at the time of the crime due to his consumption of alcohol" as a non-statutory mitigating factor. But the state trial court was not convinced on this point.

Lastly, the state trial court credited Maples's "candor" in his confession to police. The state trial court concluded that the victims not experiencing prolonged suffering or torture was not a mitigating factor.

In weighing the aggravating and mitigating circumstances, the state trial court wrote that it did find "several non-statutory mitigating circumstances in addition to the one statutory mitigating circumstance, but found them weak and

unpersuasive." In sum, the state trial court found "[t]he statutory aggravating circumstance far outweighed the mitigating facts."

On direct appeal, the Alabama appellate courts affirmed Maples's convictions and two death sentences. Maples v. State, 758 So. 2d 1 (Ala. Crim. App. 1999); Ex parte Maples, 758 So. 2d 81 (Ala. 1999).

## V.  POST-CONVICTION PROCEEDINGS IN STATE COURT

Maples pursued collateral relief in state court. In 2001, and through new counsel, Maples filed a petition for relief pursuant to Rule 32 of the Alabama Rules of Criminal Procedure (the "initial Rule 32 petition"). In September 2001, the State filed (1) an answer and motion to dismiss the initial Rule 32 petition, and (2) a proposed order as to the allegations in the initial Rule 32 petition.

In December 2001, Maples's counsel filed an amended Rule 32 petition, which is, in some places, a verbatim copy of the initial Rule 32 petition (the "amended Rule 32 petition"). However, in critical areas of the mitigation claim, the amended Rule 32 petition added names of new mitigation witnesses and the substance of those witnesses' alleged testimony about specific incidents.

As noted in the majority opinion of my colleagues, the state Rule 32 court in 2003 dismissed Maples's amended Rule 32 petition on the pleadings. But the state Rule 32 court signed verbatim the State's September 2001 proposed order, even though that order was drafted prior to Maples filing his amended Rule 32 petition

46

and thus did not address the many substantive new allegations contained in Maples's amended Rule 32 petition. The Rule 32 court merely struck through "2001" on the signature line, wrote in the 2003 date, and signed the order.

Accordingly, I agree with the majority opinion that the state court's Rule 32 decision (1) relied on a "wrong set of facts" taken from the initial Rule 32 petition in 2001, (2) did not consider the additional, substantive mitigation facts alleged in the amended Rule 32 petition in 2003, and (3) thus did not consider the totality of the available mitigating evidence. Importantly too, under the unique procedural history here, Maples did not timely appeal the Rule 32 court's ruling and, thus, there is no Alabama appellate decision on Maples's amended Rule 32 petition to review.

As a result, the federal district court, and now this Court, are left with only the state trial court's Rule 32 decision that (1) did not mention or consider Maples's operative amended Rule 32 petition, and (2) incorrectly said Maples had not named his new mitigation witnesses and had not produced the substance of their mitigation testimony, when in fact Maples had done just that in his amended Rule 32 petition. Thus, I agree with my colleagues' majority opinion that the district court, and now this Court, must conduct de novo review.

Where the majority and I part company is over the prejudice ruling in the majority opinion. Taking as true all factual allegations in Maples's amended Rule

47

32 and § 2254 petitions,[4] I agree with the district court that Maples has not shown either actual prejudice to overcome his procedural default or Strickland prejudice. The district court first denied the amended § 2254 petition based on Maples's failure to timely appeal the Rule 32 court's decision and failure to exhaust his mitigation claim in state court. This Court affirmed. Maples v. Allen, 586 F.3d 879 (11th Cir. 2009).

Reversing, the United States Supreme Court found that Maples's collateral counsel (Sullivan & Cromwell in New York), who filed Maples's amended Rule 32 petition and did not timely appeal the Rule 32 court's decision, essentially "abandoned" him, which constituted "ample cause . . . to excuse the procedural default in which he was trapped when counsel of record abandoned him without a word of warning." Maples v. Thomas, 565 U.S. 266, 289, 132 S. Ct. 912, 927 (2012).

The Supreme Court, however, remanded to our Court to consider whether Maples could establish the prejudice necessary to excuse his procedural default, id. at 927-28, and we remanded the prejudice issue to the district court. Maples v. Comm'r, Ala. Dep't of Corr., 460 F. App'x 860 (11th Cir. 2012) (unpublished). The district court concluded Maples had not established prejudice to excuse his

---

[4]Maples's allegations in his amended Rule 32 petition are substantially identical to those in his amended § 2254 petition, although his § 2254 petition alleged for the first time that his maternal grandmother suffered from Pseudotumor Cerebri, a brain condition.

procedural default or <u>Strickland</u> prejudice either.  This is now Maples's appeal of that prejudice ruling.  I review the district court's thorough order and then why I agree Maples has not shown prejudice.

## VI.  DISTRICT COURT'S PREJUDICE RULING

In a 178-page order, the district court denied Maples's amended § 2254 petition.  The district court initially found that the state Rule 32 court's order was an adjudication on the merits and was entitled to AEDPA deference.  The district court reasoned that "[a]lthough the wholesale adoption of a party's proposed opinion may be disfavored, it is not per se illegal or improper."

Nonetheless, the district court also recognized that (1) Maples's <u>amended</u> Rule 32 petition provided additional details that were lacking in his <u>initial</u> Rule 32 petition, such as the names of the new witnesses and the substance of their mitigation testimony, and (2) the Rule 32 court's ruling that some claims lacked details and specificity was therefore unreasonable.  Thus, the district court also conducted <u>de novo</u> review of all allegations in Maples's amended Rule 32 and § 2254 petitions.[5]

---

[5]The district court noted that Maples's reply brief in federal court for the first time also made new allegations that were never made in his amended Rule 32 petition in state court.  For example, Maples's reply brief alleged that his father and stepmother, Phillip and Elyse Maples, abused him physically and emotionally, including beating him, burning him with cigarettes, and forcing him to sleep in the woods.  That is a wholly new claim never made in the amended Rule 32 and § 2254 petitions.

The district court rejected the new allegations made in the reply brief as unexhausted and procedurally defaulted.  Maples does not appeal that ruling.  Indeed, Maples does not rely on

At bottom, the district court determined that, even under de novo review and even if proven, Maples's allegations did not show the requisite prejudice, his mitigation claim was procedurally defaulted, and his Strickland claim failed too. Because the showings of prejudice with respect to procedural default and Strickland "overlap," the district court stated that it would consider them simultaneously. Because the district court took all of Maples's allegations as true and proven, the district court referred to Maples's allegations as "mitigation evidence."

In deciding the prejudice issue in its 178-page order, the district court grouped Maples's allegedly new mitigation evidence into these seven subsets: (1) Maples's family history (the abuse and abandonment by his birth mother); (2) Maples's good character references; (3) Maples's drug addiction, including his efforts at recovery, depression, and suicide attempts; (4) Maples's assistance to law enforcement; (5) counsel's failure to procure a "competent" psychological evaluation; (6) Maples's post-arrest behavior; and (7) Maples's head trauma.

First, as to his abusive childhood inflicted by his birth mother, the district court concluded the additional mitigation evidence was cumulative of the trial mitigation evidence because it consisted of "the same examples, perhaps with more details, or different examples of abuse and abandonment of Maples by his mother."

these newly added allegations in this appeal at all. In his reply brief on appeal, Maples explicitly states that his claim relies on the allegations in his amended Rule 32 petition.

The district court determined that "[e]ven if the state court unreasonably determined that Maples failed to identify witnesses and the substance of their testimony in the amended Rule 32 petition, its decision that any additional testimony from witnesses would have been cumulative of that presented at trial is not an unreasonable application of Strickland."  Alternatively, the district court determined that "even if this aspect of the claim is considered de novo, Maples's allegations, if true, fail to show Strickland actual prejudice because this court finds the alleged [mitigation] testimony was merely cumulative of the [mitigation] testimony presented at trial and would not have changed the result of the penalty phase."

Second, as to Maples's "character references," the district court determined that much of the additional mitigation testimony Maples hopes to offer is cumulative of the trial testimony by his father, stepmother, Dr. Shealy, and some witnesses during the guilt phase.  In any event, the new character evidence consisted of generic impressions of Maples's good nature, which would have only spurred the prosecution to highlight gruesome details of the murders and argue how, "despite his intelligence and supportive extended family, Maples chose a culture of drugs and violence over education and responsibility."  Even under de novo review, the district court concluded that the additional good-character testimony was cumulative, refuted by the record, or was at best "generic good

51

character evidence that either carries with it an aggravating edge or could have spurred the prosecutor to undermine it." In sum, the district court found the new character evidence "double-edged" and "minimally consequential."

Third, as to Maples's depression, suicide attempts, and drug abuse, the district court noted that Maples's amended petitions "frame[d] this claim in such a way that the relevance of the depression and suicide attempts is tied to another mitigating factor that was well known to the jury – his history of drug abuse and his attempted recovery." The district court concluded that even if Maples's depression and suicide attempts were part of the evidence put before the jury to show that Maples suffered from a serious drug addiction, "this evidence would not likely have changed the balance of aggravating and mitigating factors such that there is a reasonable probability that the outcome of the penalty phase of trial would have been different." While noting that "no reasonable jurist would agree" with the Rule 32 court that Maples had failed to identify mitigation witnesses and describe the substance of their testimony in his amended Rule 32 petition on this point, Maples was not entitled to relief because he had not established prejudice.

Fourth, as to Maples's assistance to law enforcement in the arrest of drug dealer Mark Carrell, the district court found that such testimony "likely would have caused the prosecutor to present and emphasize Maples's prior lawless behavior." Maples himself had been buying and using illegal drugs for years. The prosecutor

52

would have emphasized that Maples may have turned informant for reasons of personal revenge.[6]

Fifth, as to Dr. Shealy's testimony, the district court determined that Maples's allegations, even if true, did not show why Dr. Shealy's diagnosis of passive-aggressive personality disorder is wrong, how Dr. Shealy's testimony was confusing or misleading, or how counsel's preparation of Dr. Shealy was inadequate.

Sixth, as to Maples's good behavior in jail, the district court found "very little likelihood that such evidence would have influenced either the jury or the trial court."

Seventh, as to his two instances of head trauma, the district court noted that Maples had not described: (1) what Elyse Maples or his friends could have said about the nature and severity of his head injuries; (2) the effect of the head injuries on his behavior or mental state; or (3) why Dr. Shealy's testimony failed to adequately explain the impact of these head injuries.[7]

---

[6]It was already known to the jury that, on a different occasion, Maples had ripped off his former best friend, Kenneth, in retribution for Kenneth sleeping with Maples's girlfriend.

[7]For the first time before the district court, Maples alleged that his counsel had "notice" of his "diminished mental capacity" caused by "brain injury." At trial, Maples's counsel argued that he had diminished mental capacity due to alcohol and drug use, not past head traumas. The district court rejected these new allegations as unexhausted and procedurally defaulted and, alternatively, concluded that the state court record did not support Maples's contention that counsel had "notice" of his now alleged brain injury.

Even accepting as true all of Maples's allegations in his amended Rule 32 and § 2254 petitions, the district court determined that Maples had not demonstrated prejudice based on the state-court record and, thus, it denied Maples's request for an evidentiary hearing.

Before discussing why the district court's prejudice ruling should be affirmed, I review the relevant law as to prejudice required to overcome procedural default and Strickland prejudice.

## VII.  PREJUDICE FOR PROCEDURAL DEFAULT AND STRICKLAND

Federal courts may not entertain claims from a state habeas petitioner that are procedurally defaulted.  Maples, 565 U.S. at 280, 132 S. Ct. at 922.  Claims are procedurally defaulted when a state court has declined to address those claims due to a failure by the prisoner to meet some state procedural requirement and the state judgment rests on independent and adequate state procedural grounds.  Id. Procedural default can be overcome, however, by a showing of cause and "actual prejudice."  United States v. Frady, 456 U.S. 152, 167-68, 102 S. Ct. 1584, 1594 (1982).  Because the U.S. Supreme Court already determined that cause exists for Maples's procedural default (failing to timely appeal the Rule 32 order), the district court correctly confined its opinion to whether he can establish "actual prejudice" to excuse his procedural default.

The State argues that this means Maples must meet both Strickland's prejudice standard and the "more rigorous" "actual prejudice" standard needed to overcome procedural default. But the district court properly concluded that, under the particular circumstances here, the prejudice inquiries overlap. See Mincey v. Head, 206 F.3d 1106, 1147 & n.86 (11th Cir. 2000) (explaining that Strickland prejudice and the prejudice required to overcome procedural default are "one and the same") (citing Prou v. United States, 199 F.3d 37, 49 (1st Cir. 1999) (concluding that the Frady and Strickland prejudice standards are one and the same)); see also Harris v. Comm'r, Ala. Dep't of Corrs., 874 F.3d 682, 688 (11th Cir. 2017) ("[T]he prejudice showing for overcoming the procedural default is coterminous with the prejudice showing [a petitioner] must make to prove [his] ineffective assistance of counsel claim."). In other words, in this case, the procedural-default and merits inquiries fold together—if Maples can show Strickland prejudice, he has shown "actual prejudice" sufficient to excuse his procedural default. So this brings us to what Maples must show to establish Strickland prejudice. [8]

---

[8]For purposes of this appeal, and because the threshold issue is prejudice, I will assume arguendo that Maples's trial counsel's performance was deficient as to the investigation and presentation of mitigating evidence and discuss only prejudice.

At this juncture, there is no testimony by Maples's trial counsel as to (1) what investigation they did or did not do and their reasons for doing so, (2) what Maples told them, or (3) what strategic decisions they made. Therefore, because this case has a threshold prejudice issue for procedural default and that prejudice analysis is essentially the same as Strickland prejudice, I focus on the prejudice issue.

As for Strickland's prejudice prong, the standard is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. Because Maples alleges ineffective assistance at the penalty phase, he must show a "reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Puiatti v. Sec'y, Fla. Dep't of Corr., 732 F.3d 1255, 1286 (11th Cir. 2013) (internal quotation marks omitted). A reasonable probability is "a probability sufficient to undermine confidence" in the outcome. Johnson, 643 F.3d at 935 (internal quotation marks omitted); see also Rose v. McNeil, 634 F.3d 1224, 1242 (11th Cir. 2011). "The likelihood of a different outcome must be substantial, not just conceivable." Rose, 634 F.3d at 1242 (internal quotation marks omitted).

In assessing prejudice, we consider the totality of the mitigation evidence—including the evidence adduced at trial and the new evidence adduced at the habeas proceeding—and "reweigh" it against the evidence in aggravation. Puiatti, 732 F.3d at 1286 (citing Porter v. McCollum, 558 U.S. 30, 41, 130 S. Ct. 447, 453-54 (2009)); see also Wong v. Belmontes, 558 U.S. 15, 26, 130 S. Ct. 383, 390 (2009) (per curiam) ("[T]he reviewing court must consider all the evidence—the good and the bad—when evaluating prejudice.").

56

For the reasons explained below, I agree with the district court that Maples has not established prejudice.

## VIII.  DISCUSSION

As an initial matter, there was compelling evidence in aggravation.  Maples killed two young men, one of whom was a good friend, by shooting them each twice in the head at point-blank range, unceremoniously dumping their bodies, and stealing his friend's red Camaro, and cavalierly escaping out of state until he was caught a month later still with his friend's car.  The state trial court found the existence of one statutory aggravating circumstance: that Maples committed the murders during the commission of the theft of his friend's Camaro.  None of Maples's post-conviction allegations undermines this statutory highly aggravating circumstance.

More importantly, this is not a case in which trial counsel presented no mitigating evidence.  Rather, at trial the jury was well aware of Maples's abuseive birth mother, his other family background, his serious drug and alcohol abuse, his drug rehab, and other personal background.  Most of Maples's new allegations are cumulative of the themes already advanced at trial.

Time and again, the United States Supreme Court and this Court have held that a defendant-petitioner failed to show prejudice when his allegedly new mitigation evidence was essentially cumulative of that presented at trial.  See, e.g.,

57

Cullen v. Pinholster, 563 U.S. 170, 200-01, 131 S. Ct. 1388, 1409-10 (2011) ("The 'new' evidence largely duplicated the mitigation evidence at trial. School and medical records basically substantiate the testimony of [the petitioner's] mother and brother. Declarations from [the petitioner's] siblings support his mother's testimony that his stepfather was abusive and explain that [the petitioner] was beaten with fists, belts, and even wooden boards."); Wong, 558 U.S. at 22-23, 130 S. Ct. at 387-88 (holding that "[s]ome of the [additional mitigating] evidence was merely cumulative of the humanizing evidence [the petitioner] actually presented" because the jury was "well-acquainted with [the petitioner's] background and potential humanizing features" (internal quotation marks omitted)); Tanzi v. Sec'y, Fla. Dep't of Corr., 772 F.3d 644, 660 (11th Cir. 2014) (holding that the mitigating evidence presented at the petitioner's postconviction hearing, while not "identical" to the mitigating evidence presented at trial, was "substantially the same in all relevant respects (albeit more detailed)"); Holsey v. Warden, Georgia Diagnostic Prison, 694 F.3d 1230, 1262-66 (11th Cir. 2012) (concluding that the state supreme court's determination—that the petitioner's additional mitigating evidence regarding his limited intelligence and his troubled, abusive childhood was "largely cumulative" of the evidence presented at trial—was not unreasonable where the petitioner merely presented "more details" and a "larger pool of information of the same type already offered"); Pooler, 702 F.3d at 1276 (rejecting prejudice claim

58

where the "new" evidence of the petitioner's good character and military service was cumulative of that presented at trial); Boyd, 592 F.3d at 1297-98 (finding that much of the evidence presented by the petitioner during postconviction proceedings "was in some measure cumulative" of the trial evidence because "much (although not all) of the 'new' testimony introduced at the post-conviction hearing would simply have amplified the themes already raised at trial"); Rhode v. Hall, 582 F.3d 1273, 1287 (11th Cir. 2009) ("At best, the evidence would have been cumulative, providing more information about [the petitioner]'s bad childhood and early exposure to drugs and alcohol.").[9]

The same holds true here. The majority of what Maples presented in his amended Rule 32 and § 2254 petitions was additional evidence of previous mitigation factors that were already presented to the jury. For example, Maples presented to the jury that: (1) his birth mother regularly beat him, choked him, and slapped him; (2) his birth mother left Maples in the car with the windows rolled up and once tied Maples to a chair and beat him with a broom handle; (3) his birth

---

[9]This approach is consistent with that taken by our sister circuits too. See, e.g., Jackson v. Bradshaw, 681 F.3d 753, 769–70 (6th Cir. 2012) (holding that evidence presented during collateral proceedings was "largely cumulative" of evidence presented during sentencing because the collateral evidence provided only a "larger pool of information of the same type already offered" at sentencing); Paul v. United States, 534 F.3d 832, 842–43 (8th Cir. 2008) (holding that "[m]uch of the new [collateral] evidence cited by [the petitioner] [was] largely cumulative of evidence that was presented . . . at the penalty phase of the trial" although the collateral evidence might have provided "more detail about [the petitioner]'s difficult and abusive childhood or his compassionate character"); Buckner v. Polk, 453 F.3d 195, 207 (4th Cir. 2006) ("To the extent that the [new] affidavits provide new detail of the stories of [the petitioner]'s brother's death and his father's alcoholism, we conclude that this new detail is largely cumulative.").

mother would also viciously attack his father, Phillip, stabbing him and pouring hot grease on him; (4) his birth mother abandoned him not once but twice; (5) when Maples reunited with his birth mother at age 17, he only lived with her for two to three months, during which time she was again abusive and neglectful; (6) it was during or directly after this time with his birth mother that Maples became heavily involved in drugs and was living on the streets; and (7) Phillip Maples testified that he saw a change in his son after Maples briefly went to live with his mother at age 17.

While Maples's amended Rule 32 and § 2254 petitions provided some additional details about Maples's abusive birth mother—her violent, self-mutilating tantrums, her attack on Phillip with a metal hairbrush, trying to sell Maples to a neighbor when he was three years old—these are simply "more or better examples" of the same story. Our Court has instructed that providing a state collateral court with mere cumulative evidence—that is, a "larger pool of information of the same type already offered" that "merely amplifie[s] the themes" of sentencing by "expanding on and providing more details and different examples" is insufficient to demonstrate prejudice. Holsey, 694 F.3d at 1260-61, 1263.

Indeed, Maples's new allegations about how his mother's abuse affected him—how he cried for his mother until his early teenage years, how he would ask

family members about his mother and why she left him, and how her second abandonment of him when he was 17 deeply hurt him—are very similar to evidence that the jury heard from his parents, Phillip (father) and Elyse Maples (stepmother), about how Maples was changed after going to live with his birth mother at 17, how he fell in with a rough crowd, began doing heavy drugs, and was living on the streets. It is also strikingly similar to the testimony Dr. Shealy gave about how the birth mother's early abuse and neglect likely caused Maples's drug abuse and Maples's desire to project a "tough guy" image. In sum, the jury knew the parameters and many of the details of Maples's birth mother's abuse, along with the fact that she abandoned Maples not once, but twice. They knew from Dr. Shealy the long-term effect this sort of parental abuse has on children, and they heard from Phillip and Elyse Maples how Maples went into a tailspin after his birth mother left Maples a second time.

The allegations in the amended Rule 32 and § 2254 petitions at most might have "amplifie[d]" these themes, but they did not present something radically different or even new. See id. at 1263. Thus, as to the birth mother's abuse and abandonment of Maples, I agree with the district court that the allegations in the amended Rule 32 and § 2254 petitions are largely cumulative of the evidence put before the jury and do not change the overall picture. See Marquard v. Sec'y for Dep't of Corr., 429 F.3d 1278, 1308 (11th Cir. 2005) ("There is no reason to

61

believe that added details about Marquard's troubled childhood and substance abuse—which the sentencing court clearly recognized in imposing a death sentence—would have had any effect on the sentence."); Robinson v. Moore, 300 F.3d 1320, 1347 (11th Cir. 2002) ("While the additional mitigation witnesses procured by Robinson's 3.850 counsel could have presented the resentencing jury and trial judge with more details, or different examples, of these aspects of Robinson's life, these aspects of his life were nonetheless known to the resentencing jury and trial judge.").

But this is not all. The jury also heard ample testimony about Maples's own serious problems with drug addiction, his stay at the Quest rehab center in an effort to stop using drugs and alcohol, his help to law enforcement, and his family's view that he was a well-behaved, smart child who did not present any problems until he began abusing drugs. In that sense, the so-called "new" evidence of his good moral character, friendliness, efforts to beat his drug addiction, and assistance to law enforcement are similarly cumulative of the trial testimony. But important to the prejudice assessment, this "new" evidence carried a bad downside.

As this Court has noted, a § 2254 petitioner cannot establish prejudice when there is a "virtual certainty" that the introduction of "good" mitigating evidence "would have led to the introduction of 'bad' evidence." Reed v. Sec'y, Fla. Dep't of Corr., 593 F.3d 1217, 1246 (11th Cir. 2010); see also Wong, 558 U.S. at 25, 130

S. Ct. at 389 ("A heavyhanded case to portray [the petitioner] in a positive light . . . would have invited the strongest possible evidence in rebuttal—the evidence that [the petitioner] was responsible for not one but two murders.").

Here, the prosecutor could have readily flipped this "good" evidence into a liability by pointing out how, despite coming from an environment with a loving and helpful father and step-mother, other affectionate and concerned family members, and a life full of supportive friends, caring teachers, and skilled coaches, Maples nonetheless left high school in his senior year and chose a life of drug addiction and then coldly murdered even his good friend in order to take his friend's red Camaro, while killing a second young man in order to do so. See Jones v. GDCP Warden, 815 F.3d 689, 716-17 (11th Cir. 2016) (noting the mitigating nature of certain new evidence but pointing out that a "substantial flaw[]" in that evidence was how it "would have opened the door to a vast array of aggravating evidence that likely would have overwhelmed the balance of mitigating evidence"); see also Pooler, 702 F.3d at 1275 ("Much of the 3.850 evidence Pooler claims his trial counsel . . . should have presented in the penalty phase was not mitigating but aggravating, or else would have opened the door to the introduction of aggravating evidence that would have diluted its impact.").[10]

---

[10]The new evidence Maples alleges is testimony from Maples's childhood friends, teachers, and other family members, such as the Farrells (an aunt and uncle), the Rays (extended family), and Daniel Maples (a half-brother). Maples alleges they will testify he had good moral

63

The belated assistance-to-law-enforcement evidence suffers from similar problems. The prosecutor could have noted that Maples had a history of both heavy drug use and getting revenge on people who wronged him—i.e., ripping off his friend Kenneth Hall during a drug deal after Hall slept with Maples's girlfriend—and suggested that Maples's intentions in helping the police were less than honorable.

The other problem with this so-called good-character evidence is that it is weak in light of Maples's confession to murdering his good friend and a young man simply hitching a ride home in such a cold-blooded and execution-style manner. See Brooks v. Comm'r, Ala. Dep't of Corr., 719 F.3d 1292, 1301 (11th Cir. 2013) ("A reasonable jurist could conclude that evidence that Brooks had been a nice, polite, and nonviolent person would not sway a jury from its recommendation of death, especially in light of the aggravating circumstances in the case that directly and powerfully contradicted any generic impression of Brooks's good nature.").

character, was friendly and polite, worked hard, was a fun-loving person, and did what he was told.

It is worth noting that at this stage, the district court accepted Maples's allegations as true as to the friends, teachers, and other family members who would say good things about him. However, it remains to be seen (at the evidentiary hearing before the district court) if Maples can actually prove his allegations or if these witnesses, on cross-examination, might have to admit Maples's various negative traits or other bad conduct that the jury never heard about.

In any event, the State did not introduce any evidence at all at the first penalty phase, but that would not be what happens when Maples must now try to prove his alleged good moral character and positive demeanor on remand. But taking all of Maples's allegations as true and proven, and even with no additional evidence by the State, the district court properly found Maples had not shown prejudice.

64

Further, the alleged non-cumulative mitigating evidence is also weak and unpersuasive. As a new mitigation factor, Maples emphasizes his post-arrest good behavior, nightmares, and prescription for depression medication. But given the heinous and cold-blooded nature of Maples's double murders, I do not believe the jury would have given this post-arrest mitigating circumstance much, if any, weight.

That leaves Maples's new allegations of depression and suicidal behavior while he was abusing drugs and his two alleged head traumas. The jury was actually aware of Maples's past drug addiction and Dr. Shealy's diagnosis that Maples was suffering from mild situational depression, likely caused by being in prison. But evidence of a wider depression after dropping out of high school,[11] his multiple suicide attempts (during his periods of drug use), his taking antidepressant medication while in prison, and his head traumas were mostly not before the jury. In this regard, trial counsel actually had in their possession Maples's application to the Quest drug rehab center, which chronicled his past drug use and suicide attempts. Maples suggests that Heather Davis, his ex-girlfriend, could have testified that Maples once took more than 30 sleeping pills and drank a bottle of

---

[11]In his amended Rule 32 petition, Maples tied the time frame of his depression to his years of serious drug use, between the time he dropped out of high school in 1992 and when he went to drug rehab in 1994. For the first time in his reply brief before the district court, Maples alleged that he had a long history of depression and emotional disorders, but the district court rightly did not credit those allegations. I also note again that Maples does not rely on the new allegations from his reply brief in this appeal.

alcohol before crashing his step-mother's car. This is yet another example of new mitigation evidence that also had a bad downside.

In any event, there are no allegations regarding: (1) whether Maples's depression and suicidal ideation were in place at the time of the murders (which took place shortly after he got out of drug rehab); (2) what effect, if any, the head traumas had on Maples, how they affected his cognitive function, if at all, whether Maples sustained brain damage or how severe any such damage was; or (3) whether any of these factors contributed to the execution-style slayings of Terry and Robinson. There are simply no allegations tying Maples's depression, suicidal ideation, or alleged head traumas to the brutal double murders he committed. Indeed, both the trial testimony and post-conviction allegations demonstrate that Maples is intelligent, read at a college level, and had no brain damage or neurological deficiencies. The evidence instead points to the cold-blooded act of a clear-thinking man—he shot his good friend and an acquaintance at point-blank range, dumped their bodies, stole the red Camaro, and drove it out of state to enjoy that nice car and escape the consequences. He was not found for over a month, but for sure he still had that coveted red Camaro.

Simply put, the cumulative weight of all the allegations of mitigating evidence made in Maples's operative petitions falls far short of the powerful and compelling evidence that the Supreme Court has held sufficient to satisfy the

66

prejudice prong in a brutal murder case.  See, e.g., Porter, 558 U.S. at 41, 130 S. Ct. at 454 ("Had Porter's counsel been effective, the judge and jury . . . would have heard about (1) Porter's heroic military service in two of the most critical—and horrific—battles of the Korean War, (2) his struggles to regain normality upon his return from war, (3) his childhood history of physical abuse, and (4) his brain abnormality, difficulty reading and writing, and limited schooling."); Rompilla v. Beard, 545 U.S. 374, 390-93, 125 S. Ct. 2456, 2467-69 (2005) (Rompilla's trial counsel failed to discover or present evidence that Rompilla (1) had test results pointing to schizophrenia, fetal alcohol syndrome, and stunted mental development, (2) was beaten by his father with fists, leather straps, belts, and sticks, (3) was locked in a small wire mesh dog pen filled with excrement, (4) was not allowed to visit other children or speak on the phone, and (5) lived without indoor plumbing, slept in an unheated attic, and attended school in rags); Wiggins v. Smith, 539 U.S. 510, 516-17, 534-35, 123 S. Ct. 2527, 2532-33, 2542 (2003) (trial counsel offered no evidence of Wiggins's life history, which included (1) being left alone for days at a time with no food, forcing him to beg for food and eat paint chips and garbage, (2) beatings for breaking into the locked kitchen, and (3) being passed among various foster homes, where he was physically abused and also suffered repeated molestations, rapes, and gang-rapes); Williams v. Taylor, 529 U.S. 362, 395-97, 120 S. Ct. 1495, 1514-15 (2000) (holding that petitioner was

prejudiced where his trial counsel failed to present evidence of his "nightmarish childhood," neglect and abuse by his parents, and "borderline" mental retardation, along with testimony of the petitioner's good deeds and improvement while in prison).

In addition, Maples's new mitigation evidence is simply an extension of what the jury heard, which is critically different from the above cases, in which the new mitigation was not only powerful, but of a type that counsel did not present at all in the sentencing phase. See, e.g., Porter, 558 U.S. at 41, 130 S. Ct. at 454 (noting that the "judge and jury at Porter's original sentencing heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability," including the powerful evidence of Porter's heroic and emotionally scarring military service); Rompilla, 545 U.S. at 393, 125 S. Ct. at 2469 (finding that the evidence discovered after trial "adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury"); see also Hardwick v. Sec'y, Fla. Dep't of Corr., 803 F.3d 541, 558-59 (11th Cir. 2015) (concluding that petitioner had shown prejudice where sentencing judge and jury heard "none" of the available mitigating evidence regarding the petitioner's family history of abuse, neglect, and dysfunction, his years of substance abuse or his diagnosis of schizophrenia).

68

On appeal, Maples relies heavily on a few cases where this Court found prejudice to exist, but those cases involved materially different factual circumstances and do not help Maples.  For example, in Johnson, this Court determined that the jury never heard any evidence that: (1) Johnson's parents were alcoholics; (2) Johnson was sent to live with his grandparents when his father abandoned the family; (3) Johnson and his siblings would hide in their bedroom "huddled together in terror" when his father would come home drunk and beat their mother; (4) Johnson's mother severely abused him physically and emotionally; (5) their grandparents inflicted "horrible" physical and emotional abuse on their grandchildren in a home his brother described as "pure hell"; and (6) Johnson witnessed his mother's repeated suicide attempts and found her body when she eventually succeeded in killing herself.  Johnson, 643 F.3d at 935-37.  In granting habeas relief, this Court concluded that, "[t]he description, details, and depth of abuse in Johnson's background . . . far exceeded what the jury was told" and trial counsel "could have painted for the jury the picture of a young man who resembled the tormented soul in 'The Scream.'"  Id. at 936, 938.

Similarly, in Williams v. Allen, the defendant's mother was the sole mitigation witness.  542 F.3d 1326, 1329, 1331-32 (11th Cir. 2008).  Her "brief testimony" did not mention the routine and vicious attacks the defendant's father would visit upon his wife and children.  Id.  The mother did little to protect her

69

children and was herself physically abusive toward the children. Id. at 1332. The jury did not hear from the psychiatrist, who would have testified that the defendant had experienced "an extreme brutalizing exposure to trauma," with a childhood marked by extensive abuse, neglect, and deprivation. Id. at 1333-34. This Court held that the mitigation evidence that his trial lawyers failed to discover "paints a vastly different picture of his background than that created by [his mother's] abbreviated testimony." Id. at 1342.

In contrast, the Maples jury heard about his birth mother's abuse and abandonment from three witnesses and heard from Dr. Shealy that her abuse and neglect had a long-lasting effect on Maples and caused him to use drugs to numb the pain.

In sum, when I review the totality of the mitigating facts alleged in Maples's amended Rule 32 and § 2254 petitions, I do not see the stark discrepancy that was present in the above cases where the Supreme Court and this Court found prejudice. Rather, this case is more like those where the Supreme Court and this Court have found no prejudice.

In light of Maples's execution-style murders of two victims to steal his friend's red Camaro, and the similarity in the basic mitigation stories told at the sentencing trial and on Rule 32 review, I agree with the district court that Maples has not demonstrated a reasonable probability that he would have received a

70

different sentence if his trial counsel had presented the additional mitigation evidence Maples contends counsel should have.

## IX.    CONCLUSION

For the foregoing reasons, I believe precedent requires that we affirm the district court's denial of Maples's § 2254 petition.  I respectfully dissent.[12]

---

[12]To be clear, the majority opinion, as did the district court, accepts all of Maples's allegations as true, but it remains to be seen what Maples can actually prove on remand.  Notably too, the district court bypassed and never made a ruling on deficient performance, and the evidentiary hearing encompasses that issue too.  Moreover, on remand, the State will have an opportunity to present evidence as well.  I anticipate that the evidence on remand will be vigorously disputed, and the district court's fact findings will need to be thorough and complete.  Given the original 178-page order by the district court, I am confident that a thorough review will occur once again.